# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>v.<br><br>RHETT GAIL VANCE,<br><br>　　　　Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br><br>Case No. 2:07-cr-00753-PMW<br><br><br>Magistrate Judge Paul M. Warner |

　　　　Before the court is Rhett Gail Vance's ("Defendant") motion to suppress.[1]  On December 18, 2007, the parties came before the court for an evidentiary hearing on Defendant's motion.[2] At the conclusion of the hearing, the court set a briefing schedule for the motion.  After his motion for an extension of time to file his supporting memorandum was granted,[3] Defendant filed his supporting memorandum on February 1, 2008.[4]  The United States of America's (the "government") memorandum in opposition to Defendant's motion was filed on February 19,

---

[1] *See* docket no. 7.

[2] *See* docket no. 11.

[3] *See* docket nos. 15, 16.

[4] *See* docket no. 17.

2008.[5]  After his motion for an extension of time to file his reply memorandum was granted,[6] Defendant filed his reply memorandum on March 6, 2008.[7]

The court has carefully reviewed the written memoranda submitted by the parties. Pursuant to civil rule 7-1(f) of the Rules of Practice for the United States District Court for the District of Utah, the court has concluded that oral argument is not necessary and will determine the motion on the basis of the written memoranda.  *See* DUCrimR 47-1 (providing that motions in criminal matters are governed by civil rule 7-1); DUCivR 7-1(f).

## BACKGROUND

The facts relevant to Defendant's motion are as follows.  On October 20, 2007, U.S. Forest Service Officer Jason Parker ("Officer Parker") was on patrol in the Uinta National Forest in the area near Mt. Nebo and the Nebo Loop Road.[8]  While patrolling that day, Officer Parker saw Defendant, who was wearing an orange jacket, standing by the rear of his pickup truck.[9] Because it was the opening weekend of the deer hunting season, and because Defendant was wearing an orange jacket, Officer Parker assumed Defendant was deer hunting.[10]  Consequently,

---

[5]  *See* docket no. 19.

[6]  *See* docket nos. 20, 21.

[7]  *See* docket no. 22.

[8]  *See* docket no. 18, Transcript of Motion to Suppress Hearing ("Tr. ___"), 7.

[9]  *See id*.

[10]  *See id*. at 8.

Officer Parker drove his vehicle near Defendant's pickup trick to determine whether Defendant had harvested a deer.[11]

After making his initial contact with Defendant, Officer Parker determined that Defendant had not harvested a deer.[12] Defendant indicated to Officer Parker that he was not in the area for hunting but was there for camping.[13] Because Officer Parker did not see any camping equipment, he asked Defendant where he was camping.[14] Defendant did not provide a specific location, but he did indicate a general area where he was camping.[15] After some discussion, both Officer Parker and Defendant determined that he was camped somewhere on the Mona Pole Trail.[16]

Because there was a storm approaching, and because Defendant had mentioned some areas with which Officer Parker was unfamiliar, Officer Parker wanted to know a more precise location of Defendant's campsite.[17] Accordingly, Officer Parker asked if Defendant would show the location of his campsite on a map.[18] In response, Defendant provided some maps to Officer

---

[11] *See id.*

[12] *See id.*

[13] *See id.*

[14] *See id.* at 8-9.

[15] *See id.* at 9.

[16] *See id.*

[17] *See id.* at 10-11.

[18] *See id.* at 11.

Parker, but Officer Parker noted that none of them was a map of the general area in which they were located.[19] As a result, Officer reiterated his concern about the potential need to locate Defendant's campsite during the approaching storm.[20]

While the two men were discussing the maps, they walked around the side of Defendant's pickup truck.[21] At that point, Officer Parker noticed a rifle leaning against the side of the truck.[22] Because Defendant had just indicated that he was not hunting, Officer Parker asked Defendant why he had the rifle.[23] In response, Defendant now indicated that he was hunting but that he did not hunt like other people.[24] Defendant further indicated that he hunted "in a pack."[25] Because Officer Parker had never heard of that type of hunting before, he found that statement to be "a little bit odd."[26] Defendant contends that Officer Parker misapprehended that statement.[27]

---

[19] *See id*.

[20] *See id*.

[21] *See id*.

[22] *See id*.

[23] *See id*. at 12.

[24] *See id*.

[25] *Id*.

[26] *Id*.

[27] *See* docket no. 17.

Defendant asserts that he told Officer Parker that "he hunted with a 'pack[,]' meaning that he hunted while wearing a back pack."[28]

After looking at the rifle, Officer Parker determined that there were rounds in it.[29] At that point, Officer Parker began to wonder if Defendant might be under the influence of alcohol or medication.[30] Not only did Officer Parker smell alcohol on Defendant's breath, but he also thought that several of Defendant's statements to that point had been rather peculiar.[31] At the hearing, Officer Parker admitted that Defendant did not slur his words, have any trouble standing or walking, have bloodshot eyes, or pose a danger to himself.[32] At the same time, however, Officer Parker indicated that Defendant "just didn't make sense" and "wasn't really focusing on [him]."[33]

Officer Parker then asked Defendant whether he was under the influence of any medications.[34] Defendant responded by telling Officer Parker that he took medication for anxiety.[35] Officer Parker asked Defendant to produce the medication and his driver's license, and

---

[28] *Id.*

[29] *See* Tr. 12.

[30] *See id.* at 12-13.

[31] *See id.*

[32] *See id.* at 28, 30.

[33] *Id.* at 30.

[34] *See id.* at 12-13.

[35] *See id.* at 13.

Defendant complied with those requests.[36] Officer Parker indicated that he asked for Defendant's driver's license for use in confirming that the medication belonged to and was prescribed for Defendant.[37]

Officer Parker then explained to Defendant "about illegal drugs in the area" and that he had "got[ten] a lot of drugs out of th[at] canyon before."[38] Officer Parker asked Defendant if he was in the possession of any narcotics or illegal drugs or if he was under the influence of any drugs.[39] Defendant indicated that he was not.[40] Defendant further indicated that he couldn't understand why Officer Parker would ask him about illegal drugs because he had never taken illegal drugs before.[41] Officer Parker asked Defendant whether he had been cited or arrested within approximately the last year.[42] According to Officer Parker, Defendant seemed to be offended by that question and indicated that he had never been in trouble with the law.[43]

---

[36] *See id.*

[37] *See id.*

[38] *Id.*

[39] *See id.*

[40] *See id.*

[41] *See id.* at 14.

[42] *See id.*

[43] *See id.*

At this point, Officer Parker asked Defendant to step over by his patrol vehicle so that he could run a warrants check on Defendant.[44] While approaching Officer Parker's vehicle, Defendant asked Officer Parker "why [he] was doing this" and indicated that Officer Parker "had no business doing this" and "was harassing him."[45] Officer Parker then noticed that Defendant had placed his hands in his pockets.[46] Officer Parker asked Defendant to keep his hands out of his pockets for safety reasons because he did not know what Defendant had in his pockets.[47] Once the two men arrived by Officer Parker's patrol vehicle, Defendant started pacing, was not complying with Officer Parker's commands, and kept putting his hands in his pockets.[48] Approximately the second or third time that Officer Parker asked Defendant to keep his hands out of his pockets, Officer Parker noticed that Defendant was throwing objects from his pockets on the ground.[49] At the same time, Defendant was yelling at Officer Parker that he had nothing illegal, that the situation was not fair, and that Officer Parker was interrupting his lunch.[50]

---

[44] *See id*.

[45] *Id*. at 15.

[46] *See id*.

[47] *See id*.

[48] *See id*. at 15-16.

[49] *See id*. at 16.

[50] *See id*.

Defendant then unfastened a small pack around his waist and threw the pack to the ground.[51] Officer Parker noticed that a large hunting knife was attached to the pack.[52]

As a result of Defendant's behavior, Officer Parker contacted dispatch and requested a back-up unit because Defendant "was kind of getting out of control and was not complying or not cooperating with [his] commands . . . to calm down and step in front of [his] truck."[53] Officer Parker then attempted to restrain Defendant so that he could put him in the patrol vehicle, but Defendant "jerked away."[54] Officer Parker eventually was able to get Defendant over by his patrol vehicle.[55] Once the they were near the patrol vehicle, however, Defendant's hands started to come up and Defendant attempted to "square off" on Officer Parker.[56] Officer Parker then took Defendant to the ground.[57] Once Defendant was on the ground, Officer Parker was able to get one hand handcuffed, but Defendant refused to allow his other hand to be handcuffed.[58] After unsuccessfully attempting to secure Defendant's free hand several times, Officer Parker asked

---

[51] *See id.*

[52] *See id.*

[53] *Id.*

[54] *Id.*

[55] *See id.*

[56] *Id.* at 16-17.

[57] *See id.* at 17.

[58] *See id.*

Defendant surrender his free hand.[59]  Defendant refused to do so.[60]  Officer Parker then struck Defendant in the ribs with his knee and was able to secure and handcuff Defendant's free hand.[61]  During this encounter, Defendant kept asking why Officer Parker was trying to put him in the patrol vehicle and trying to restrain him.[62]  He also indicated that Officer Parker had no right to do that to him and that he was going to sue Officer Parker.[63]

After handcuffing Defendant, Officer Parker sat him up.[64]  Officer Parker noticed that a civilian had stopped to see if Officer Parker needed any help.[65]  Officer Parker asked the civilian to wait at the scene until his back-up unit arrived.[66]  Upon hearing dispatch calling him on the radio, Officer Parker went to the radio in his patrol vehicle to answer that call.[67]  At or near the same time, Defendant got up off the ground and started to walk in front of Officer Parker's patrol vehicle, as if "to take off or walk off."[68]  Officer Parker went around his patrol vehicle and

---

[59] See id.

[60] See id.

[61] See id.

[62] See id. at 16.

[63] See id. at 17.

[64] See id.

[65] See id.

[66] See id. at 18.

[67] See id. at 17-18.

[68] Id. at 18.

intercepted Defendant.[69] After doing so, Officer Parker placed Defendant in the patrol vehicle, fastened a seat belt around him, and shut the door.[70]

At that point, the civilian notified Officer Parker that his wife had seen Defendant throw a brown object or container.[71] Officer Parker retrieved the object and determined that it smelled like marijuana.[72]

Officer Parker then noticed that his back-up unit had arrived.[73] While talking with that officer, Officer Parker heard a "loud commotion" coming from the other side of his patrol vehicle.[74] Officer Parker saw that Defendant had unfastened the seat belt, unlocked the door to the patrol vehicle, and exited the patrol vehicle.[75] Defendant came toward Officer Parker and the back-up officer and was yelling to the back-up officer that Officer Parker had assaulted him and that he wanted "something done about it."[76] Officer Parker placed Defendant back into his patrol vehicle and instructed him not to exit again.[77]

---

[69] *See id.*

[70] *See id.*

[71] *See id.* at 18-19.

[72] *See id.* at 19.

[73] *See id.*

[74] *Id.*

[75] *See id.*

[76] *Id.* at 19-20.

[77] *See id.* at 20.

After the back-up officer departed the scene, Officer Parker transported Defendant to Mountain View Hospital in Payson, Utah.[78] After Defendant received medical treatment, Officer Parker transported him to Utah County Jail.[79]

At the hearing, Officer Parker admitted that he did not advise Defendant of his *Miranda* rights at any time.[80] *See Miranda v. Arizona*, 384 U.S. 436 (1966). That notwithstanding, at some point after he had finally secured Defendant and retrieved the above-referenced brown object, Officer Parker asked Defendant why he had thrown the object to the ground.[81] According to Officer Parker, Defendant responded by saying, "[Y]ou're not going to find anything in my vehicle that shows that I smoked [that], besides it's a little amount anyway, and I'm not worried about it."[82] In addition, during the time Officer Parker was transporting Defendant from the scene, Officer Parker asked Defendant how much beer he had consumed that day.[83] Defendant responded by stating that he had consumed approximately one and one-half beers.[84]

---

[78] *See id*.

[79] *See id*. at 23.

[80] *See id*. at 20.

[81] *See id*. at 21.

[82] *Id*.

[83] *See id*.

[84] *See id*.

## ANALYSIS

Defendant argues that the court should (1) suppress all evidence obtained pursuant to Officer Parker's unlawful detention of Defendant that occurred prior to the point in time when Officer Parker finally secured Defendant and placed him in the patrol vehicle and (2) suppress all statements made by Defendant in response to Officer Parker's questioning after Defendant was finally secured and placed in the patrol vehicle because Defendant was not advised of his *Miranda* rights. The court will address each argument in turn.

### I. Detention

#### A. Police-Citizen Encounters

It is well settled that "police-citizen encounters come in three varieties." *United States v. Johnson*, 364 F.3d 1185, 1188 (10th Cir. 2004). The first type of encounter "involves the voluntary cooperation of a citizen in response to non-coercive questioning." *Id.* (quotations and citation omitted). The second type is an investigatory detention, also known as a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1 (1968), "involving only a brief, non-intrusive detention and frisk for weapons when officers have a reasonable suspicion that the defendant has committed a crime or is about to do so." *Johnson*, 364 F.3d at 1188 (quotations and citation omitted). The third type "is the arrest of the defendant." *Id.* (quotations and citation omitted).

As to the first type of encounter, "[p]olice officers may approach citizens, ask them questions and ask to see identification without implicating the Fourth Amendment's prohibition against unreasonable searches and seizures." *Id.* at 1188-89. The second type of encounter, on the other hand, has the potential to implicate the Fourth Amendment. In order to avoid violating

the Fourth Amendment, such an investigatory detention must be supported by a reasonable suspicion of criminal activity.  *See id.* at 1188.

To determine whether an investigative detention is reasonable under the Fourth Amendment, this court must conduct a two-step inquiry.  *See Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1028 (10th Cir. 1997).  First, the court "must ascertain whether the detention was justified at its inception.  For a detention to be valid, the officer must have an articulable suspicion that a detainee has committed or is about to commit a crime."  *Id.* (quotations and citations omitted).

Second, the court must determine "whether the officer['s] actions are reasonably related in scope to the circumstances [that] justified the interference in the first place."  *Id.* (quotations and citations omitted).  More specifically, an investigative detention must "last no longer than is necessary to effectuate the purpose of the stop."  *Florida v. Royer*, 460 U.S. 491, 500 (1983).

> Once the concern that justified the initial stop is dispelled, further detention will violate the Fourth Amendment unless the additional detention is supported by a reasonable suspicion of criminal activity.  In other words, reasonable suspicion must exist at all stages of the detention, although it need not be based on the same facts throughout.

*United States v. Soto-Cervantes*, 138 F.3d 1319, 1322 (10th Cir. 1998) (citation omitted).

**B.  Reasonable Suspicion**

"Although the great majority of reasonable suspicion cases begin as compulsory traffic stops, an encounter that begins voluntarily and becomes a detention is subject to the same standards."  *United States v. Guerrero*, 472 F.3d 784, 787 (10th Cir. 2007).

> Reasonable suspicion is defined as particularized and objective basis for suspecting the particular person stopped of criminal activity. In assessing reasonable suspicion, we defer to trained law enforcement personnel, "allow[ing] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." The evaluation is made from the perspective of the reasonable *officer*, not the reasonable *person*. The Supreme Court has instructed that we not examine each factor adding up to reasonable suspicion individually, but that we evaluate how convincingly they fit together into a cohesive, convincing picture of illegal conduct. In [*United States v. Arvizu*, 534 U.S. 266, 274 (2002)], the Court rejected what it called a "divide-and-conquer analysis," noting that reasonable suspicion may exist even if "each observation" is "susceptible to an innocent explanation."

*Id*. (quoting *Arvizu*, 534 U.S. at 273-74) (other quotations and citations omitted) (first alteration in original).

In addtion,

> "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." Indeed, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. . . . Thus, as long as [an officer] has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality.

*Johnson*, 364 F.3d at 1194 (quoting *Arvizu*, 534 U.S. at 274, 277) (second alteration in original).

### C.  Officer Parker's Encounter with Defendant

Defendant takes a selective view of the facts to argue that Officer Parker's initial contact with Defendant concerning whether he had harvested a deer constituted an investigatory

14

detention. Based on that view of the facts, Defendant concedes that the first step of the two-step inquiry referenced above, *see Gallegos*, 114 F.3d at 1028, is satisfied in this case because it was legal and appropriate for Officer Parker to determine whether Defendant had harvested a deer. As to the second step of that inquiry, Defendant argues that when Officer Parker learned that Defendant had not harvested a deer, his concerns related to the investigatory detention had been dispelled, and the stop should have been terminated. Defendant maintains that Officer Parker's additional questioning of Defendant beyond the purpose of learning whether he had harvested a deer constituted an unlawful extension of the stop because Officer Parker had no reasonable suspicion of any criminal activity.

Contrary to Defendant's characterization, the court has determined that Officer Parker's initial contact with Defendant constituted nothing more than a consensual encounter. Notably, Officer Parker did not ask for Defendant's identification or a hunting license at that point in time. Instead, he merely asked Defendant whether he had harvested a deer. After Defendant indicated that he had not, he volunteered information about the fact that he was camping. Based upon his concern about an approaching storm, Officer Parker asked Defendant questions about the location of his campsite. Defendant provided confusing answers to those questions that heightened Officer Parker's concern about the potential need to locate Defendant's campsite during the approaching storm. In discussing the location of Defendant's campsite and the maps, the two men stepped away from the tailgate and around to the side of Defendant's pickup truck. The court has determined that it was at that point, at the earliest, that Officer Parker's encounter

with Defendant elevated to an investigative detention.  *See Guerrero*, 472 F.3d at 787 (noting that an encounter may begin voluntarily and become a detention).

While that eliminates Officer Parker's questions relating to the location of Defendant's campsite from the investigative detention and from Fourth Amendment implications, the court is still faced with Defendant's arguments concerning Officer Parker's remaining questions.  More specifically, the court must determine whether those remaining questions and the investigative detention satisfy the two-step inquiry referenced above.  *See Gallegos*, 114 F.3d at 1028.

After stepping around to the side of Defendant's pickup truck, Officer Parker saw a rifle leaning against it.  Upon seeing the rifle, and given Defendant's earlier statement that he was not hunting, it is not surprising Officer Parker asked Defendant about the rifle.  In response, Defendant reversed course and admitted to Officer Parker that he was indeed hunting.  Further, Officer Parker discovered that the rifle had rounds in it.  Finally, Officer Parker indicated that Defendant provided a confusing explanation about his unique hunting style and that the smell of alcohol was apparent on his breath.

Based upon those circumstances, as well as Defendant's confusing responses to Officer Parker's questions about the location of his campsite, Officer Parker became suspicious that Defendant was under the influence of alcohol, medication, or illegal drugs.  Taking the view of a reasonable officer under the totality of the circumstances presented to Officer Parker, *see Guerrero*, 472 F.3d at 787, the court concludes that reasonable suspicion existed for Officer Parker to detain Defendant for questioning.  The court recognizes Defendant's assertion that, at this point, Officer Parker had no knowledge of any illegal conduct on Defendant's part.  That

assertion misses the mark, however.  As previously noted, in making a determination that reasonable suspicion exists, the court is not required to "'rule out the possibility of innocent conduct.'" *Johnson*, 364 F.3d at 1194 (quoting *Arvizu*, 534 U.S. at 277).  Accordingly, the court concludes that the first step of the two-step inquiry referenced above is satisfied in this case.  *See Gallegos*, 114 F.3d at 1028.

Based upon his suspicions, Officer Parker proceeded to ask Defendant a series of questions about medication and illegal drugs.  Through that process, he obtained Defendant's driver's license, which he intended to use to run a warrants check on Defendant.  Then, based on Defendant's suspicious and noncompliant behavior, Officer Parker secured him and placed him in the patrol vehicle.  The court concludes that Officer Parker's investigative detention that led up to the point when Defendant was finally secured and placed in the patrol vehicle was "reasonably related in scope to the circumstances [that] justified the interference in the first place." *Id*. (quotations and citations omitted).  Officer Parker's initial suspicion included concerns about medication and illegal drugs, and his further questioning of Defendant was directly related to that initial suspicion.  In addition, Officer Parker's decision to run a warrants check on Defendant after the investigatory detention began was not a violation of Defendant's Fourth Amendment rights.  *See United States v. Villagrana-Flores*, 467 F.3d 1269, 1275 (10th Cir. 2006) (holding that it is not a violation of the Fourth Amendment for an officer to perform a warrants check as part of an investigatory detention or *Terry* stop), *cert. denied*, 127 S. Ct. 1021 (2007).  Accordingly, the court concludes that the second step of the two-step inquiry is also established.  *See Gallegos*, 114 F.3d at 1028.

In arguing that Officer Parker did not have reasonable suspicion to support the questioning and detention of Defendant, Defendant parses the elements of his behavior and argues that none of them was illegal.  More specifically, Defendant argues that it is not unlawful for an individual to consume alcohol; legally possess a firearm; be confusing to others or to himself, unless he poses a danger to himself or others; be anxious, nervous, talkative, or rattled in the presence of a law enforcement officer; be disoriented; fail to have a map of his location; or be unable to pinpoint his exact location on a map.  Even assuming for the sake of argument that each individual element, by itself, is insufficient to establish reasonable suspicion of criminal activity, that divide-and-conquer tactic for attacking reasonable suspicion has been rejected by the Supreme Court.  *See Arvizu*, 534 U.S. at 273-74; *see also Guerrero*, 472 F.3d at 787.  Accordingly, the court rejects it here.

In sum, the court has determined that Officer Parker's encounter with Defendant began as a consensual encounter that later elevated to the level of an investigatory detention that lasted until Officer Parker finally secured Defendant and placed him in the patrol vehicle.  The court has also determined that said investigatory detention did not violate Defendant's Fourth Amendment rights because both elements of the two-step inquiry for determining whether an investigative detention is reasonable are satisfied in this case.  *See Gallegos*, 114 F.3d at 1028.

## II. Statements Made After Officer Parker Finally Secured Defendant

Defendant also argues that the court should suppress all statements made by Defendant in response to Officer Parker's questioning after Defendant was finally secured and placed in Officer Parker's patrol vehicle because Defendant was not advised of his *Miranda* rights.  The

government responds to that argument by stating that it does not intend to rely upon any statements or evidence obtained from Defendant after being finally secured and placed in Officer Parker's patrol vehicle.

The court has no reason to doubt the government's assertion that it will not rely upon any statements or evidence obtained from Defendant after being finally secured and placed in Officer Parker's patrol vehicle. Nevertheless, it appears as though said statements and evidence should indeed be suppressed. Defendant was clearly in custody after being placed in Officer Parker's vehicle, and Officer Parker admitted at the hearing that he did not advise Defendant of his *Miranda* rights at any time. *See, e.g.*, *United States v. Erving L.*, 147 F.3d 1240, 1246-47 (10th Cir. 1998) (stating that "[t]he proper perspective for determining whether a suspect is in custody at the time of questioning" for purposes of *Miranda* is to look at "whether a reasonable [person] in the suspect's position would have understood his situation . . . as the functional equivalent of formal arrest" (quotations and citation omitted) (second and third alterations in original)). Accordingly, the court concludes that any statements or evidence obtained from Defendant after being finally secured and placed in Officer Parker's patrol vehicle should be suppressed.

\* \* \* \* \*

Based upon the foregoing, Defendant's motion to suppress is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Any evidence and statements obtained up to the point when Defendant was finally secured and placed into Officer Parker's vehicle shall not be suppressed.

2.  Any evidence and statements obtained after Defendant was finally secured and placed into Officer Parker's patrol vehicle shall be suppressed.

**IT IS SO ORDERED**.

DATED this 4th day of April, 2008.

BY THE COURT:

PAUL M. WARNER
United States Magistrate Judge